**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

RECTICEL AUTOMOBILESYSTEME
GMBH, AND RECTICEL INTERIORS
NORTH AMERICA, INC.,

          Case No. 2:10-cv-14097-SFC

      PLAINTIFFS,          HON. SEAN F. COX

v.

AUTOMOTIVE COMPONENTS
HOLDINGS, LLC

      DEFENDANT.

## OPINION AND ORDER CONSTRUING DISPUTED CLAIM TERMS

### I.    INTRODUCTION

This is a patent infringement case. On December 6, 2011, the Court held a hearing to construe the claim terms identified by the parties as being in dispute pursuant to *Markman v. Westview Instruments*, 517 U.S. 370 (1996). The parties submitted written briefs in support of their positions both before and after the hearing. Through conferences with the Court's Technical Advisor, the parties were able to agree on constructions for a number of claim terms. In this Opinion, the Court will construe the six claim terms identified by the parties as being in dispute.

### II.    BACKGROUND

Plaintiffs Recticel Automobilesysteme GmbH and Recticel Interiors North America, Inc. (collectively "Recticel" or "Plaintiffs") allege that Defendant Automotive Components Holdings LLC (hereinafter "ACH") has infringed U.S. Patent No. 6,071,619, entitled "Method and Spray Mould Assembly for Manufacturing an Elastomeric Skin of at Least Two Elastomeric Materials and Elastomeric Skin." The patent generally relates to a method for molding two-color interior

automotive trim parts out of plastic (such as a dashboard) that can be made to look like leather. The patent generally describes a process of covering one side of a mold with a cover, called a "mask," and spraying the other side of the mold with an elastomer of a first color. The mask is then removed and the other side of the mold is sprayed with a different color elastomer.

The patent describes a problem that existed in the prior art with the above type of molding method. When the liquid elastomer that is sprayed is in contact with both the mask and the mold surface, a problem arises when the mask is removed. As the mask is pulled away, liquid elastomer that is touching both the mask and the mold surface starts to string or form threads. As the mask is pulled farther away from the mold surface, some of the threads drop into the side of the mold that was previously covered by the mask resulting in a scrap part. As an analogy, one can think of the strings or filaments of elastomer being akin to the cheese on a slice of pizza when the slice is removed from the whole pizza. ('619 Pat. col. 2 ll. 5-7.)

The patent teaches a solution to prevent or decrease the problem of stringing or threading. The patent teaches having the edge of the mask not be in contact with the mold surface so that when elastomeric material is sprayed on the mold, the elastomeric material sprayed on the mold does not bridge or connect the surface of the mold and the mask. In other words, there is a gap or area between the edge of the mask and the surface of the mold where no elastomer is sprayed. This concept can be seen in the highlighted figures of the '619 Patent reproduced below, where the gap or area free of elastomer is shown in red. By having this design, the elastomer does not bridge or connect the mask and surface of the mold. When the mask is pulled away from the mold, threading or stringing does not occur, or is at least less likely to occur.



Figure 2
Showing Gap in Red



## III.    LAW OF CLAIM CONSTRUCTION

Claims of a patent are short and concise statements, expressed with great formality, of the metes and bounds of the patented invention.  Each claim is written in the form of a single sentence. Claim construction is the manner in which courts determine the meaning of the terms in the claim. "The construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims."  *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991).

The construction of key terms in patent claims plays a critical role in nearly every patent infringement case.  Claim construction is central to both a determination of infringement and validity

of a patent.

The judge, not a jury, is to determine the meaning of the disputed claim terms as a matter of law. *Markman v. Westview Instruments*, 517 U.S. 370 (1996).

A judge has two primary goals in construing the disputed claim terms. The first goal is to determine the scope of the patent by interpreting the disputed claim terms to the extent needed to resolve the dispute between the parties. The second goal is to provide a construction that will be understood by the jury who might otherwise misunderstand a claim term in the context of the patent specification and prosecution history of the patent. *See, e.g., Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must 'ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'"); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement."). The Court's claim construction ruling forms the basis for the ultimate jury instructions, although that is not to say that the Court cannot modify its wording for the jury instructions at a later date. *See IPPV Enters., LLC v. Echostar Commc'ns Corp.*, 106 F. Supp. 2d 595, 601 (D. Del. 2000).

The seminal case setting forth the principles for construing disputed claim terms is *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). According to *Phillips*, the words of the claim are generally given their ordinary and customary meaning – the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id*. at 1312-1313. The person of ordinary skill in the art views the claim term in context of the entire intrinsic record, which is the entire claim, the other parts

of the patent, and, if in evidence, the prosecution history of the patent before the United States Patent and Trademark Office. *Id*. at 1313-1314. Although a claim must be construed in context of the entire patent and its prosecution history, the court should normally not read limitations or features of the exemplary and preferred embodiments discussed in the patent's written description and drawings into the claims. *Id*. at 1323-1324.

The prosecution history of the patent can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention during the course of prosecution by his statements, making the claim scope narrower than it would otherwise be. However, because the prosecution history is an ongoing negotiation between the patent office and the patent owner, rather than the final product of that negotiation, it often lacks the clarity of the patent itself and is generally less useful for claim construction purposes. *Id*. at 1317.

In discerning the meaning of claim terms, resorting to dictionaries and treatises may also be helpful. *Id*. at 1320-1323. However, undue reliance on extrinsic evidence, such as dictionaries, poses the risk that the dictionary definition will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification of the patent and the prosecution history, thereby undermining the public notice function of patents. *Id*.

In the end, the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be the correct construction. *Id*. at 1316.

## IV.    CLAIM CONSTRUCTION ANALYSIS FOR DISPUTED CLAIM TERMS

The parties have requested that the Court construe a number of claim terms. The Court will address each disputed claim term in the following sections.

## A.    "ELASTOMERIC" IN CLAIMS 1-5, 19, AND 22

| Disputed Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| "elastomeric" (Claims 1-5, 19, 22) | "Elastomeric" is a property of a substance such that the substance is able to approximately resume its original shape when a deforming force is removed. | Stretchable and light-stable reaction product of polyol and isocyanate. | **"Elastomeric" is a** property of a polymer or rubber substance such that the substance is able to approximately resume its original shape when a deforming force is removed. |

The parties request that the Court construe the claim term "elastomeric" in Claims 1-5, 19, and 22 of the '619 Patent.

By way of example, Claim 1 states as follows with the disputed claim language underlined:

1. A method for manufacturing an <u>elastomeric</u> skin with surface portions of at least two <u>elastomeric</u> materials by spraying said <u>elastomeric</u> materials against a mould surface, in which method a portion of said mould surface is shielded off by means of a mask having at least one edge delimiting said mould surface portion, a layer of a first <u>elastomeric</u> material is sprayed onto said mould surface and onto said mask edge, said mask is removed, and a layer of a second <u>elastomeric</u> material is sprayed onto said mould surface portion, characterized in that said mask edge is placed on top of at least one upstanding edge on the mould surface, said upstanding edge delimiting together with said mask edge said mould surface portion and said first <u>elastomeric</u> material is sprayed onto one side of said upstanding edge.

Recticel argues that this "elastomeric" should be construed as follows: "'Elastomeric' is a property of a substance such that the substance is able to approximately resume its original shape when a deforming force is removed."

ACH proposes the following construction: "Stretchable and light-stable reaction product of polyol and isocynate."

Recticel argues that ACH's proposed construction violates the rule of claim construction

that preferred embodiments from the written description section of the patent should not be read into the claims. Recticel argues that "elastomeric" is a broader term than a reaction product of polyol and isocyanate and may include other types of elastomers not made from a polyol and isocyanate. Recticel points to dictionary definitions of "elastomer" or "elastic." Those related dictionary definitions include "any of various elastic substances resembling rubber;" "capable of recovering shape or size after being stretched, pressed or squeezed together;" "a natural synthetic polymer having elastic properties, e.g. rubber;" and "an elastic rubber like substance."

ACH agrees that the root "elast" in "elastomeric" or "elastomer" refers to a "stretchable property of a material." (ACH's resp. br. at 7, Dkt. No. 33.) ACH also quotes from various dictionaries that define "elastomer", for example, to mean "elastic rubber like substance" and "elastic" to mean "capable of being easily stretched or expanded and of snapping back or resuming former shape." However, ACH argues that Recticel's proposed construction for "elastomeric" is overly broad and encompasses thousands of materials with rubber like properties, while the written description of the '619 Patent describes the elastomeric material as being a light stable reaction product of a polyol and isocyanate.

The first issue that must be addressed is whether the elastomer should be limited to a "reaction product of polyol and isocynate" as argued by ACH.

In coming to the proper construction for a disputed claim term, the Court starts with the language of the claim itself. The disputed claim term "elastomeric" is used in the claims as an adjective to describe the type of materials sprayed into the mold (i.e., "elastomeric materials") and the ultimate end product (i.e., an "elastomeric skin"). The claim term "elastomeric" on its face is not limited to a reaction product of a polyol and isocyanate. The term simply describes the component materials and end product as a polymer or rubber having elastic properties (stretchable, flexible, etc.).

Next, in order to interpret the disputed claim term, the Court turns to see how the disputed claim term is used in the written description section of the patent. According to the Federal Circuit, the written description, along with the claims, "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. The written description of the '619 Patent uses the term "elastomeric" generally to refer to stretchable or elastic type of materials, but states that the typical material will be polyurethane elastomers. For example, the introductory section of the written description states:

> The present invention relates to a method for manufacturing an elastomeric skin comprising surface portions of <u>at least two elastomeric materials, in particular two differently coloured polyurethane materials</u>, by spraying said elastomeric materials against a mould surface, . . . .

> A first object of the present invention is to provide a method for manufacturing an elastomeric skin of at least two elastomeric materials which allows to achieve an aesthetic visual parting line between the elastomeric materials, for example in order to produce dash-boards or other interior trim parts for the automotive industry in two or more different colours.

> \*      \*      \*

> A problem arising when using the masking technique for spraying <u>viscous elastomeric materials, in particular polyurethane reaction mixtures,</u> is the formation of filaments or threads of elastomeric material upon removing the mask due to the fact that the sprayed layer of elastomeric material extends from the mould surface up to the mask.

('619 Pat. col. 1 ll. 6-23 and col. 1-2 ll. 66-4.)

The '619 patent also discusses "elastomeric" when describing its preferred or exemplary embodiment:

> As to the elastomeric materials used in the method according to the present invention, reference is made in particular to the light-stable polyurethane elastomeric materials disclosed in EP-A-0379246 of the present applicant, which is incorporated herein by way of reference.

('619 Pat. col. 5 ll. 21-25.)  None of the above language would signal to a person of ordinary skill in the art that the term "elastomeric" should be understood to be limited to a reaction product of a polyol and isocyanate.  The above language is simply describing a preferred or exemplary embodiment of the invention.

The '619 Patent sets forth a very specific example in a separate "example" section of the patent.  However, before discussing the example, the '619 Patent specifically states this embodiment is an "example" and that the "skilled person will be able to conceive many different examples" based on the teachings of the patent.  ('619 pat. col. 5 ll. 42-49.)  The '619 Patent then goes on to disclose the specific example.  Specifically, the patent states:

> In this position, a first elastomeric material 7, in particular a polyol-isocyanate reaction mixture was sprayed on the uncovered mould surface and partially onto the mask 4, at a flow rate of 25 g/sec., the polyol component pressure being 150 bars and the pressure of the isocyanate component being 100 bars.

> \*    \*    \*

> As soon as the first polyurethane reaction mixture was sprayed onto the mould surface 2, the mask 4 was removed and a second polyurethane reaction mixture 9, having the same composition as the first one, except for the presence of 5 parts of grey colour paste instead of black colour paste in the polyol component, was sprayed onto the remaining portion 3 of the mould surface 2 and partially onto the layer of first reaction mixture.

(*Id*. at col. 5-6 ll. 65-42.)  It is clear that this section of the patent is simply describing an example and is not limiting the scope of the claim to the product of a polyol and isocyanate.

The Court next turns to the prosecution history to see if the prosecution history sheds light on how a person of ordinary skill in the art would understand the disputed claim term.  As Recticel points out, during prosecution, the Examiner of the United States Patent Office cited and discussed prior art references which teach using elastomers that are not a reactive product made from a polyol and isocyanate.  For example, Recticel points out that the Examiner rejected the pending claims in

9

the first Office Action mailed October 19, 1998 as obvious based on U.S. Patent No. 5,370,831 and U.S. Patent No. 5,328,723. The '831 Patent discloses spraying onto a mold surface particles selected from "any powdered thermoplastic or thermosetting polymeric material," which includes materials that are not a reactive product of a polyol and isocyanate. ('831 Pat. col. 3 ll. 40-46.) Likewise, the '723 Patent does not teach limiting the elastomer to a "reaction product of a polyol and an isocyanate." This evidence implies that the Examiner and Recticel understood that the term "elastomer" was not limited to a reactive product of a polyol and isocyanate. The Court finds that the prosecution history supports Recticel's position that the term "elastomeric" is not limited to the "reactive product of a polyol and isocyanate."

Accordingly, after considering all of the parties' arguments and the evidence presented, the Court will not limit the claim term "elastomeric" to the product of a polyol and isocyanate.

The next issue that must be addressed is whether the term "elastomeric" should be limited to "light-stable" materials. At the outset, the term elastomeric is used many times in the specification without any mention that the material must be light-stable. In support of its argument that elastomeric materials should be limited to light-stable materials, ACH points to the following statement in the written description, which describes an optional foam backing layer: "This further layer may be a light-stable elastomeric layer like the first and second elastomeric materials or it may be a not [sic] light-stable elastomeric layer." (*Id*. at col. 3 ll. 15-17.) ACH argues that this language, by implication, means that the "elastomeric materials" must be light-stable materials. The Court finds that this statement in the written description describes a preferred embodiment and does not intentionally limit the claim language. The Court finds that using a light-stable elastomer is a preferred embodiment, but the specification as a whole does not signal that the elastomers must be light-stable.

10

Accordingly, the Court adopts Recticel's proposed construction: "Elastomeric" is a property of a polymer or rubber substance such that the substance is able to approximately resume its original shape when a deforming force is removed.

## B. "SKIN" IN CLAIMS 1, 5, 19, AND 22

| Disputed Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| "skin" (Claims 1, 5, 19, 22) | "Skin" means the outer layer(s) of a product, including the surface, particularly for automotive trim components. | A self-supporting layer capable of being de-molded. | The Court finds that this claim term does not need to be construed as it will be understood by a jury in the context of the claimed invention. |

The parties request that the Court construe the claim term "skin" in Claims 1-5, 19, and 22 of the '619 Patent.

By way of example, Claim 1 states as follows with the disputed claim language underlined:

1. A method for manufacturing an elastomeric <u>skin</u> with surface portions of at least two elastomeric materials by spraying said elastomeric materials against a mould surface, in which method a portion of said mould surface is shielded off by means of a mask having at least one edge delimiting said mould surface portion, a layer of a first elastomeric material is sprayed onto said mould surface and onto said mask edge, said mask is removed, and a layer of a second elastomeric material is sprayed onto said mould surface portion, characterized in that said mask edge is placed on top of at least one upstanding edge on the mould surface, said upstanding edge delimiting together with said mask edge said mould surface portion and said first elastomeric material is sprayed onto one side of said upstanding edge.

Recticel argues that "skin" should be construed as follows: "the outer layer(s) of a product, including the surface, particularly for automotive trim components."

ACH proposes the following construction: "A self-supporting-layer capable of being de-molded."

Recticel argues that the '619 Patent uses the term "skin", or "elastomeric skin," to simply describe the outer layer or layers of the product. Recticel argues that ACH's proposed construction is improper and argues that ACH is trying to read a limitation or feature of the examples from the written description section of the patent into the claims.

ACH argues that its construction is correct because in order for the elastomeric skin to be removable from the mold, the outer surface layer of elastomeric materials must be thick enough to be self-supporting (i.e., "a self-supporting layer capable of being demolded"). ACH appears to be arguing that a skin layer itself must be sufficiently self-supporting so as to be removable from the mold. Under ACH's proposed construction, the claim language would not appear to cover a configuration having a thin non-demoldable outer elastomeric layer that is combined with some other non-elastomeric layer which allows the combination to be demoldable.

After considering the arguments and evidence of the parties, the Court finds that the intrinsic and extrinsic evidence as a whole does not weigh in favor of limiting the term "skin" to "a self-supporting layer capable of being demolded" as argued by ACH. The Court finds that the specification of the '619 Patent uses "skin" in a general way to describe the outer elastomeric layer(s) of the manufactured product.

According to the Federal Circuit's precedent on claim construction, in construing a disputed claim term, the Court is to start with the language of the claim itself. The Court finds that the claims use the term "skin" in a general way and do not support limiting the term "skin" to "a self-supporting layer capable of being demolded" as argued by ACH. For example, independent Claim 1 begins by stating: "A method for manufacturing an elastomeric skin with <u>surface portions</u> of at least two

12

elastomeric materials. . . ."     ('619 Pat. col. 6 ll. 66-67.)  By using the language "surface portions," this claim implies that the term "skin" is not limited to a single layer contrary to what appears to be ACH's position ("a self-supporting layer capable of being demolded").[1]  Moreover, this claim language uses the term "skin" in a general way and does not support limiting the term "skin" to products that are demoldable as argued by ACH.

Next, according to the Federal Circuit's rules for interpreting claim language, the Court will consider how the disputed claim term is used in the written description.  The Court finds that the written description uses the term "skin" in general terms and does not limit skin to "a self-supporting layer capable of being demolded" as argued by ACH.  The written description describes the invention generally as a method for manufacturing an elastomeric skin for use in interior trim components of automobiles.  The written description makes clear that the elastomeric skin comprises "<u>surface portions</u> of at least two elastomeric materials," which again implies that the skin is not limited to a single layer, but may be comprised of multiple layers.   Specifically, the written description states:

> The present invention relates to a method for manufacturing an elastomeric skin comprising surface portions of at least two elastomeric materials, in particular two differently coloured polyurethane materials, by spraying said elastomeric materials against a mould surface, . . . .
>
> A first object of the present invention is to provide a method for manufacturing an elastomeric skin of at least two elastomeric materials which allows to achieve an aesthetic visual parting line between the elastomeric materials, for example in order to produce dash-boards or other interior trim parts for the automotive industry in two or more different colours.

(*Id*. at col. 1 ll. 6-23.)

---

[1]  The Court assumes that ACH is not using the indefinite article "a" in its proposed claim construction to mean "one or more," which is patent parlance.  *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) (stating that indefinite article "a" in patent claims normally means "one or more").  A jury would not understand such patent parlance.  The Court assumes that ACH means to limit the scope of this claim term to a single layer.

Other portions of the written description make clear that the additional layers of plastic can be added to the back of the elastomeric layers and that the surface layer and the additional layers together form the skin. Specifically, the '619 Patent states:

> Both elastomeric materials 7,9 are usually applied in a layer of .1 to 5 mm, and preferably in a layer of .2 to .5 mm. Subsequently, a further layer of plastic material, whether coloured or not, can be applied against the back of the first elastomeric materials to obtain a skin of the desired thickness and the thus produced skin can be demoulded.

(*Id*. at col. 3 ll. 11-14.) This section of the written description of the patent clearly indicates that the skin does not need to be a single layer. ACH argues that the previous above quoted section of the written description supports its argument that the molded skin must be thick enough such that it is self-supporting and can be removed from the mold. The Court disagrees. The above quoted section of the written description discusses a preferred way for making a skin, but does not define the scope of the word "skin" as being sufficiently thick that it is self-supporting and demoldable.

ACH also cites to a section of the written description entitled "EXAMPLE" to support its proposed construction. In this section of the written description, the patent sets forth a very specific example of the invention including the exact chemical formulation of the components, thicknesses of the various layers, and the method used to make the invention. In this example, the patentee makes clear that the optional additional plastic layers can be added to the back of the outer elastomeric surface layers to make the skin. Specifically, the written description states:

> In the present example, both elastomeric materials were applied in a layer of about 0.4 mm. Subsequently, a backing layer of a further elastomeric material 19 was sprayed against the back of the first and second elastomeric materials to obtain a total skin thickness of about 1 mm. This backing layer 19 was achieved by means of a light-stable uncoloured polyurethane reaction mixture having the same composition as the first and the second polyurethane reaction mixture, the polyol component containing however no colour paste.

The thus produced skin was processed further to a dashboard by applying a polyurethane foam layer 20 against the back thereof and a rigid support 21.

(*Id*. at col. 6 ll. 45-56.)

ACH argues that the above statements in the written description support its proposed construction because they infer that the skin must be thick enough and self-supporting so that it can be removed from the mold without damaging the skin. The Court disagrees. The Court finds that the above quoted language was not intended to limit the meaning of the term "skin." This language is an example of a particular preferred way of using the invention. Moreover, this plastic backing layer discussed in the above quoted section is set forth in dependent Claim 4 and is not required by independent Claim 1.

The Court now turns to the extrinsic evidence. ACH argues that the prosecution history of a separate Recticel European patent (EP-0379246) supports the understanding that the skin must be sufficiently thick so that it can be demolded. In the prosecution history of EP-0379246, Recticel made a statement to the European Patent Office, which ACH argues shows that Recticel understood "skin" to mean sufficiently thick to be "demoldable" as opposed to a coating which is not demoldable. (ACH br. ex. G at p. 65, dkt. no. 33-8.) Although the Court has considered this extrinsic evidence and has given it the appropriate weight in the claim construction analysis, the Court does not believe that this extrinsic evidence is particularly strong. While the '619 Patent incorporates by reference EP-0379246 for a type of elastomeric material that can be used in the invention, the '619 patent does not incorporate the prosecution history of EP-0379246 to limit or define the meaning of "skin." ('619 Pat. col. 5 ll. 21-25.) *See Zenon Envtl., Inc. v. U.S. Filter Corp*., 506 F.3d 1370, 1378 (Fed. Cir. 2007) ("To incorporate material by reference the host document must identify with *detailed particularity* what specific material it incorporates and *clearly indicate where* that material is found

in the various documents.").   Moreover, the claim in the then pending European patent application explicitly stated that the skin is demoldable.  (ACH br. ex. G at p. 67, dkt. no. 33-8.)  In addition, while the '619 Patent and EP-0379246 patent were commonly owned by Recticel, the patents are otherwise unrelated, do not have common inventors, and it appears that the patent attorney who drafted the European patent is not the same.  *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167-68 (Fed. Cir. 2004) (holding that unrelated patents or prosecution histories are given little, if any, weight).

After carefully considering the parties' arguments and all the evidence presented, the Court finds that the term "skin" as used in the disputed claims does not need to be construed.  The term "skin" as used in this automotive technology will be understood by the jury.  The Court will not limit the term "skin" to a "a self-supporting-layer capable of being de-molded."

### C.      "PLASTIC BACKING LAYER" IN CLAIM 4

| Disputed Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
| --- | --- | --- | --- |
| "Plastic backing layer" (Claim 4) | "Plastic backing layer" means one or more layers of plastic applied to the back of the elastomeric layers. | A backing layer of foam, rigid material or elastomeric material. | This claim term will be understood by a jury and does not need to be construed. |

The parties request that the Court construe the claim language "plastic backing layer" in Claim 4 of the '619 Patent.  Claim 4 is a dependent claim that depends from Claim 1.

Claims 1 and 4 are reproduced below.  The disputed claim language is Claim 4 is underlined:

1. A method for manufacturing an elastomeric skin with surface portions of at least two elastomeric materials by spraying said elastomeric materials against a mould surface, in which method a portion of said mould surface is shielded off by means of

16

a mask having at least one edge delimiting said mould surface portion, a layer of a first elastomeric material is sprayed onto said mould surface and onto said mask edge, said mask is removed, and a layer of a second elastomeric material is sprayed onto said mould surface portion, characterized in that said mask edge is placed on top of at least one upstanding edge on the mould surface, said upstanding edge delimiting together with said mask edge said mould surface portion and said first elastomeric material is sprayed onto one side of said upstanding edge.

4. A method according to claim 1, characterized in that a <u>plastic backing layer</u> is applied against said layers of elastomeric materials.

Recticel argues that the term "plastic backing layer" should be construed as follows: "Plastic backing layer means one or more layers of plastic applied to the back of the elastomeric layers."

ACH proposes the following construction: "A backing layer of foam, rigid material or elastomeric material."

Neither side fully addressed this disputed claim term in their briefs.

Two particular sections of the written description of the patent, which are reproduced below, discuss the plastic backing layer. These sections of the '619 Patent explain that after the initial surface layers of elastomeric materials are sprayed in the mold, another layer of plastic material can be sprayed or applied on the back of the first elastomeric materials. Specifically, the written description of the '619 Patent states:

Both elastomeric materials 7, 9 are usually applied in a layer of 0.1 to 5 mm, and preferably in a layer of 0.2 to 0.5 mm. Subsequently, <u>a further layer of plastic material</u>, whether coloured or not, can be applied against the back of the first elastomeric materials to obtain a skin of the desired thickness and the thus produced skin can be demoulded. This further layer may be a light-stable elastomeric layer like the first and second elastomeric materials or it may be a not [sic] light-stable elastomeric layer. The density of this layer may even be reduced through the use of blowing agents and may consequently consist of a foam layer for example as disclosed in WO 93/23237. This PCT patent application moreover discloses to apply further layers, such as rigid supports into the same mould 1 to manufacture an entire moulded piece therein. Of course, such a rigid support could also be applied afterwards.

*    *    *

17

In the present example, both elastomeric materials were applied in a layer of about 0.4 mm. Subsequently, <u>a backing layer of a further elastomeric material</u> 19 was sprayed against the back of the first and second elastomeric materials to obtain a total skin thickness of about 1 mm. This backing layer 19 was achieved by means of a light-stable uncoloured polyurethane reaction mixture having the same composition as the first an the second polyurethane reaction mixture, the polyol component containing however no colour paste.

The thus produced skin was processed further to a dashboard by applying a polyurethane foam layer 20 against the back thereof and a rigid support 21.

(*Id*. at col. 3 ll. 9-25 and col 6 ll. 45-56.)

Figure 13 of the patent illustrates one embodiment of a plastic backing layer 19 that forms part of the elastomeric skin along with the first and second elastomeric layers 7 and 9.



FIG. 13

After considering the parties' arguments, the Court finds that "plastic backing layer" does not need to be construed because this claim term will be readily understood by even a lay jury. The parties have not explained why this claim term is relevant to the infringement or invalidity arguments that may be made at trial. As the Court currently understands the issues in the case, this claim term does not need to be construed.

**D.    "MEANS FOR MAINTAINING . . . MASK EDGE AT A DISTANCE" IN CLAIM 19**

| Disputed Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Means for maintaining…mask edge at a distance" (Claim 19) | The term "means for maintaining … mask edge at a distance" is written in 35 U.S.C. §112, sixth paragraph form.<br><br>**The function**: Maintaining a mask edge apart from the mould surface.<br><br>**The structure**: Any of (1) an arm, (2) centering supports, (3) a portion of the mask projecting over an upstanding edge or (4) a curvature of the mould surface, and equivalents. | This phrase is incapable of being construed and is indefinite. | The Court finds that the function set forth in the claim is: "maintaining said mask edge at a distance from said mold surface such as to avoid contact between the layer of said first elastomeric material sprayed onto the mold surface and said mask."<br>The corresponding structures disclosed in the specification for accomplishing the claimed function are: (1) where an edge of the mask projects over an upstanding edge of the mold surface such that a gap is formed between the mask edge and the surface of the mold which remains substantially free of the first elastomeric material (e.g., Figures 2 and 4-9 of the '619 Patent), or (2) where there is a mold surface having a raised edge that is curved and there is a mask located above the raised edge of the mold surface such that a gap is formed between the mask edge and the surface of the mold that remains substantially free of the first elastomeric material as shown in Figure 3 of the '619 Patent. |

The parties request that the Court construe the claim language "means for maintaining . . . mask edge at a distance" in Claim 19 of the '619 Patent.

Claims 19 is reproduced below. The disputed claim language and other corresponding claim language are underlined:

> 19. A spray mould assembly for manufacturing an elastomeric skin with surface portions of at least two elastomeric materials comprising a mould, defining a mould surface, and at least one mask for shielding off a portion of said mould surface and having at least one edge delimiting said portion, said mould surface comprising at least one upstanding edge, said assembly comprising <u>means for maintaining said mask edge at a distance from said mould surface</u> upon spraying said first elastomeric material <u>to avoid contact between said layer of said first elastomeric material sprayed onto said mould surface and said mask</u>, said mask and said at least one upstanding edge together delimiting said shielded off portion of said mould surface.

Recticel and ACH agree that this disputed claim limitation is a means-plus-function claim limitation according to 35 U.S.C. § 112 ¶ 6.

Construing a means-plus function claim limitation is a two step process: (1) identify the function set forth in the claim language; and (2) identify the corresponding structure disclosed in the entire specification section of the patent that accomplishes the claimed function. *Medical Instrumentation & Diagnostics Corp.*, 344 F.3d 1205, 1210 (Fed. Cir. 2003).

Recticel argues that the function set forth in the claim language is: "maintaining a mask edge apart from the mold surface." Recticel identifies the corresponding structure from the specification as: "Any of (1) an arm, (2) centering supports, (3) a portion of the mask projecting over an upstanding edge or (4) a curvature of the mould surface, and equivalents."

Although agreeing that this claim limitation is a means-plus-function claim limitation, ACH argues that this claim language is incapable of being construed and therefore the claim is invalid for being "indefinite" under 35 U.S.C. § 112 ¶ 2. ACH's argument appears to be that while the claim

language states that the mask edge is kept apart from the mold surface, the drawings only show a mask touching the mold surface.  In other words, ACH's argument is that the drawings and written description do not support or match up with the claim language.  Therefore, ACH argues that the claim is invalid.

In its reply brief, Recticel argues that ACH misunderstands the claim language.  Recticel points out that the claim language only requires that the mask edge, not the entire mask, be maintained at a distance from the mold surface.  When the claim language is properly understood, Recticel argues that the claim is definite and valid.

To understand the parties' arguments and the claimed invention, it is helpful to look at the drawings in the '619 Patent.  For example, Figure 2 is reproduced below:



Figure 2
Showing Gap in Red

Claim 19 states that the mask edge 11 is maintained at a distance from the surface of the mold 13 such as to avoid contact between the layer of said first elastomeric material sprayed onto the mold surface and the mask.  The written description explains that this results in a gap being created between the

mask edge and the surface of the mold where there is an absence of elastomer (shown in red in the above reproduction of Figure 2). Specifically, the written description states as follows:

> In the embodiment of FIG. 2, this gap is mainly achieved by the fact that the edge 11 of the mask 4 projects over the upstanding edge 13. In this way, the distance between the edge 11 of the mask 4 and the mould surface 2, measured in the spray direction 14 of the spray beam next to the edge 11, comprises in particular 0.5 to 20 mm, and more particularly 1 to 6 mm. The distance A over which the edge 11 projects over the upstanding edge 13 is usually smaller than the height H of the upstanding edge 13.

(*Id*. at col. 3 ll. 54-62.)

This disputed claim limitation is similar to a term in Claim 3 on which the parties have agreed on a construction. Claim 3 contains the term "maintained at a distance." The parties have agreed that "mask edge is maintained at distance" should be construed as follows:

> The mask edge and mould surface define a gap therebetween that remains substantially free of the first elastomeric material when sprayed.

(Modified Meet and Confer Agreed Constructions.)

"A determination that a patent claim is invalid for failure to meet the definiteness requirement of 35 U.S.C. § 112 ¶ 2 is a legal conclusion that is drawn from the court's performance of its duty as a construer of patent claims. . . . " *Biomedino, LLC v. Waters Techs. Corp*., 490 F.3d 946, 949 (Fed. Cir. 2007) (quotations omitted). A claim is sufficiently definite if "one skilled in the art would understand the bounds of the claims when read in light of the specification." *Exxon Research & Eng'g Co. v. U.S.*, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

The Court disagrees with ACH's arguments that this claim limitation is indefinite. ACH's argument appears to be that while the claim language states that the mask edge is kept apart from the mold surface, the drawings only show a mask touching the mold surface. (ACH br. at p. 16 ("in every figure of the '619 Patent, the mask is in direct contact with the mold surface.")) ACH is confusing "mask edge" with "mask." The figures of the '619 Patent show the edge of the mask 11 not touching

the mold surface. This can be seen in the above highlighted version of Figure 2 of the '619 Patent, which shows a distance "A" colored in red between the edge of the mask and surface of the mold measured along the spray direction. Accordingly, the Court rejects ACH's indefiniteness argument.

The Court finds that the function set forth in the claim is the following: "maintaining said mask edge at a distance from said mold surface such as to avoid contact between the layer of said first elastomeric material sprayed onto the mold surface and said mask." ('619 Pat. col. 8 ll. 30 and col. 2 ll. 15-18.) This function identified by the Court is different than the function identified by the parties. The parties failed to include the functional claim language "to avoid contact between said layer of said first elastomeric material sprayed onto said mould surface and said mask. . . ." The Court finds that this functional language forms part of the claimed function. This additional functional language is a key part of the claimed invention.

Next, the Court must identify the corresponding structure disclosed in the written description that accomplishes the function set forth in the claim. The written description discloses two ways to maintain a distance between the mask edge and the mold surface measured along the spray direction such as to avoid having the first layer of elastomer that is sprayed on the mold surface touch the mask. First, the written description describes having the mask edge hang over an upstanding edge of the mold surface (see Figures 2 and 4-9 of the '619 Patent). Second, the written description states that the upstanding edge can be curved to create a distance between the edge of the mask and the upstanding portion of the mold (see Figure 3 of the '619 Patent). Specifically, the relevant portion of the written description states:

> According to a further aspect of the method according to the invention, the mask 4 is placed with its edges 11 on top of upstanding edges 13 on the mould surface 2, in particular at the parting line between the two elastomeric materials where this line remains visibly important. At the other locations, where the parting line between both

23

elastomeric materials will be less important, for example hidden behind strips, such upstanding edges 13 may be omitted or reduced. When indicating that the edges 11 are placed on top of the upstanding edges 13, this does not mean that the mask 4 has to actually contact these edges 13 but could also be placed on a certain distance above these edges 13 as it will be clear hereinafter.

At the upstanding edges 13, the first elastomeric material 7 is sprayed onto one side thereof and partially onto the edges 11 of the mask 4, with a gap being preferably achieved between the elastomeric material 7 sprayed onto the upstanding edge 13 and the mask 4, as can be seen clearly in FIGS. 2 to 9.

In the embodiment of FIG. 2, this gap is mainly achieved by the fact that the edge 11 of the mask 4 projects over the upstanding edge 13. In this way, the distance between the edge 11 of the mask 4 and the mould surface 2, measured in the spray direction 14 of the spray beam next to the edge 11, comprises in particular 0.5 to 20 mm, and more particularly 1 to 6 mm. The distance A over which the edge 11 projects over the upstanding edge 13 is usually smaller than the height H of the upstanding edge 13.

As shown in FIG. 3, the edge 11 of the mask 4 does not always have to project over the upstanding edges 13, but a distance between the edge 11 of the mask 4 and the mould surface 2 could possibly also be obtained in accordance with the first aspect of the invention by an appropriate curvature of the mould surface 2, more particularly of the top of the upstanding edges 13.

(*Id*. at col. 3-4 ll. 54-2).  Figure 2, reproduced above, and Figure 3, reproduced below, show

examples of the structures.



Accordingly, the Court finds that the corresponding structures disclosed in the specification

for performing the function set forth in the claim are: (1) where an edge of the mask projects over an

upstanding edge of the mold surface such that a gap is formed between the mask edge and the surface

of the mold which remains substantially free of the first elastomeric material (e.g., Figures 2 and 4-9 of the '619 Patent), or (2) where there is a mold surface having a raised edge that is curved and there is a mask located above the raised edge of the mold surface such that a gap is formed between the mask edge and the surface of the mold that remains substantially free of the first elastomeric material as shown in Figure 3 of the '619 Patent. The Court's construction is similar and consistent with the parties' agreed upon construction for the claim term "mask edge is maintained at a distance" in Claim 3.

The Court also notes that the '619 patent makes clear that the mask can be physically maintained in place by using an "arm 5, and possibly through the intermediary of centering supports 12. . . ." ('619 Pat. col. 3 ll. 30-34.) However, the parties have not made clear if the physical structure maintaining the mask surface in place above the mold surface is material to the infringement and invalidity issues at issue in this case. To the extent that this is material, the Court will address this as part of the dispositive motions or before trial if the parties bring the issue to the Court's attention.

## E. "PARTING LINE" IN CLAIM 22

| Disputed Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Parting line" (Claim 22) | "Parting line" means the visual border between adjacent elastomeric materials on the surface of an elastomeric skin. | This phrase is incapable of being construed and is indefinite. | "Parting line" means the visual border between adjacent elastomeric materials on the surface of an elastomeric skin. |

The parties request that the Court construe the claim language "parting line" in Claim 22 of the '619 Patent.

Claim 22 is reproduced below. The disputed claim language is underlined:

25

22. An elastomeric skin with surface portions of at least two elastomeric materials and made by the method according to claim 3, wherein said first and second elastomeric materials form a first and respectively a second sprayed layer, and wherein said first and second elastomeric materials are adhered to each other along a <u>parting line</u> which is formed by a gradual transition zone between these materials and at least a portion of which is located in an outer recess of the elastomeric skin, the first and second layers being curved inwards into said outer recess.

This claim language makes clear that the first and second elastomeric materials are adhered to each other along a visual dividing line, called "a parting line," at a recess in the surface of the skin where the colors of the two plastic materials transition.  (*Id.*)

Recticel argues that "parting line" in Claim 22 "means the visual border between adjacent elastomeric materials on the surface of an elastomeric skin."

ACH argues that "parting line" is incapable of being construed and is therefore indefinite.  It appears that ACH's argument is that the claim term is indefinite because there is no reference numeral 23 in Figure 13 actually pointing to an example of a parting line.  (ACH Resp. br. at p. 21-22.)

The Court finds that Recticel's proposed construction is correct.  The parting line is described in the patent as the visual dividing line between the two colors of plastic materials.  The following sections from the written description describe the parting line:

In this method the transition between the different elastomeric materials is achieved on the upstanding edge of the mould surface or, when seen from the outside of the elastomeric skin, in a recess of the skin. The actual transition between the elastomeric materials is therefore hidden from view resulting in a nicely finished <u>parting line</u> between the different elastomeric materials and this in an industrially suited way.

\* \* \*

Referring to FIG. 13, the obtained two-colour skin had a nicely finished parting line between the differently coloured portions since the actual transition between the different materials in the recess 23 at this parting line, forming in fact a gradual transition zone 22, was well hidden from view. If desired, this recess can of course be filled up afterwards or be closed by pressing and/or gluing the sides

thereof together.

(*Id*. at col. 1 ll. 58-65 and col. 6 ll. 57-64.) Figure 13, reproduced below, depicts the general

parting line at the recess area where the first elastomer (7) and second elastomer (9) overlap or

come together.



FIG. 13

Accordingly, the Court construes "parting line" as the visual border between adjacent

elastomeric materials on the surface of an elastomeric skin."

ACH argues that this claim term "parting line" is indefinite at least in part because there

is no reference numeral 23 in Figure 13 actually pointing to an example of a parting line. (Resp.

br. at p. 21-22.) The Court disagrees. The fact that Figure 13 does not contain a specific

reference number 23 does not make the term "parting line" unclear and indefinite. A person of

ordinary skill in art who has read the claim and the specification as a whole would understand

the concept and limits of a parting line.

## F.    "GRADUAL TRANSITION ZONE" IN CLAIM 22

| Disputed Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Construction |
|---|---|---|---|
| "Gradual transition zone" (Claim 22) | "Gradual transition zone" means an area between separate layers of elastomeric material on the surface of an elastomeric skin that shows a change from one material to another across the area in degrees. | This phrase is incapable of being construed and is indefinite. | "Gradual transition zone" means an "an area between separate layers of elastomeric material on the surface of an elastomeric skin where a gradual change from one elastomeric material to another occurs." |

The parties request that the Court construe the claim language "gradual transition zone" in Claim 22 of the '619 Patent.

Claim 22 is reproduced below.  The disputed claim language is underlined:

22. An elastomeric skin with surface portions of at least two elastomeric materials and made by the method according to claim 3, wherein said first and second elastomeric materials form a first and respectively a second sprayed layer, and wherein said first and second elastomeric materials are adhered to each other along a parting line which is formed by a gradual transition zone between these materials and at least a portion of which is located in an outer recess of the elastomeric skin, the first and second layers being curved inwards into said outer recess.

This claim language makes clear that the visible parting line, or dividing line, between the two colors of elastomers, occurs at "a gradual transition zone" in a recess of the elastomeric skin   (*Id.*)  This is shown in Figure 13 of the '619 Patent, reproduced below, and explained below in the following section of the written description:

In this method the transition between the different elastomeric materials is achieved on the upstanding edge of the mould surface or, when seen from the outside of the elastomeric skin, in a recess of the skin. The actual transition between the elastomeric materials is therefore hidden from view resulting in a

nicely finished parting line between the different elastomeric materials and this in an industrially suited way.

*     *     *

Referring to FIG. 13, the obtained two-colour skin had a nicely finished parting line between the differently coloured portions since the actual transition between the different materials in the recess 23 at this parting line, forming in fact <u>a gradual transition zone 22</u>, was well hidden from view. If desired, this recess can of course be filled up afterwards or be closed by pressing and/or gluing the sides thereof together.

(*Id*. at col. 1 ll. 58-65 and col. 6 ll. 57-64.)



**FIG. 13**

Recticel argues that "gradual transition zone" in Claim 22 "means an area between separate layers of elastomeric material on the surface of an elastomeric skin that shows a change from one material to another across the area in degrees."

ACH argues that "gradual transition zone" partly is incapable of being construed and is therefore indefinite. It appears that ACH's argument is that Figure 13 does not actually show a gradual transition from the first elastomer to the second elastomer in the recess. However, ACH is relying upon an old, incorrect version of Figure 13. The United States Patent Office issued a corrected Figure 13 in a "Certificate of Correction." This corrected Figure 13, reproduced above, shows a transition from one color of elastomer to the other elastomer in the recess at

reference numeral 22. This corrected Figure 13 also provides context for the meaning of "gradual."

The Federal Circuit has held that words of degree such as "gradual" are not indefinite if a person of ordinary skill in the art would understand what was claimed. *See Andrew Corp. v. Gabriel Electronics, Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) (reversing the district court's decision that claim terms "closely approximate" and "substantially equal" were indefinite); *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.*, 275 F.3d 1347, 1359-60 (Fed. Cir. 2001) (affirming JMOL that claim limitation "substantially completely wetted" was not indefinite); *Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1120 (Fed. Cir. 2002) (vacating summary judgment decision that claims to a hollow push rod reciting a "substantially constant wall thickness" were indefinite).

Based on the limited arguments and evidence before the Court at the claim construction stage of this case, the Court finds that a person of ordinary skill in the art who has read the claim and the specification as a whole would understand the concept and limits of the disputed claim language. Accordingly, the Court rejects ACH's indefiniteness argument.

Given the limited space in the briefs devoted this indefiniteness argument and ACH's reliance on an incorrect version of Figure 13, the Court finds that this particular indefiniteness argument would be better addressed at the summary judgment stage of the case should ACH believe that this argument needs to be revisited. However, based on the evidence presented, the Court finds that this claim language would be sufficiently understood by a person of ordinary skill in the art. *See, e.g., Waddington N. Am., Inc. v. Sabert Corp.*, 2010 WL 4363137, at *2 (D.N.J. 2010) (holding that indefiniteness was properly deferred until the summary judgment stage of the case).

The Court construes "gradual transition zone" as "an area between separate layers of elastomeric material on the surface of an elastomeric skin where a gradual change from one elastomeric material to another occurs."

**IV.    CONCLUSION**

The Court will schedule a status conference on **May 22, 2012 at 2:00 p.m.** Before the status conference, the parties shall meet and propose a schedule for this case (e.g., through dispositive motions).  The parties may work with the Court's Technical Advisor Christopher G. Darrow in preparing the proposed schedule.

**SO ORDERED**


S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  April 16, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 16, 2012, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager